**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

No. 96-20705

SYLVESTER L. PETERSON,

Plaintiff-Appellant,

versus

BOBBY WILSON, ET AL.,

Defendants,

BOBBY WILSON,

Defendant-Appellee.

Appeal from the United States District Court
for the Southern District of Texas

May 18, 1998

Before KING, DUHÉ and WIENER, Circuit Judges.

WIENER, Circuit Judge.

The case we review today was twice tried to verdict by civil juries. The first trial ended in a verdict favorable to Plaintiff-Appellant Sylvester L. Peterson and unfavorable to Defendant-Appellee Bobby Wilson, but the district court granted a new trial. The second trial ended in a verdict rejecting all of Peterson's claims and exonerating Wilson. This appeal turns on whether the district court abused its discretion when, at the conclusion of the first trial, it granted Wilson a new one: If that was error and

was not harmless, we must reverse and remand for entry of judgment for Peterson; but if the grant of the new trial was not error or was harmless error, then we must affirm the new trial order and proceed to consider Peterson's appeal from the court's final take-nothing judgment rendered in accordance with the jury verdict against him at the conclusion of the second trial. Our review of the record of the first trial and the applicable law leads to the unavoidable conclusion that the district court abused its discretion in granting a new trial after the jury found for Peterson in the first trial, and that doing so was not harmless, i.e., it constituted reversible error. We therefore vacate the verdict and judgment from the second trial, reverse the district court's order granting the new trial, and remand this case to the district court with instructions to enter judgment for Peterson in accordance with the first jury verdict and to award appropriate costs, including attorneys' fees, and interest. As such, we need not and therefore do not reach Peterson's assignments of error in connection with the second trial.

I

FACTS AND PROCEEDINGS

A.    Perspective

It is important that the issues before us on appeal today be examined within the appropriate framework, for only then can we comprehend how the district court's new trial order constituted an abuse of discretion that produced reversible error. And, because Wilson moved for a judgment as a matter of law (j.m.l.) at the

2

completion of Peterson's case and again when all evidence was in ——
and coupled the latter j.m.l. motion with an alternative motion for
new trial[1] —— the version of the facts that is most favorable to
the jury's verdict is sufficiently important by way of background
and context to bear reiteration, at least in pertinent part.  This
is particularly true given that (1) Wilson urged his new trial
motion on grounds of sufficiency of the evidence only, i.e., that
the verdict was against the great weight of the evidence, (2) the
reasons given by the district court in ordering a new trial were
entirely different from the reasons espoused in Wilson's motion,
thereby confirming that the order was <u>sua</u> <u>sponte</u> despite the
court's statement that it was granting Wilson's motion, and (3) a
district court's grant of a new trial can be appropriate, even in
the total absence of a motion from the aggrieved party.[2]  We shall
therefore review an abbreviated version of the facts and inferences
in the light most favorable to the verdict, then examine the reason
stated by the district court as the basis for granting a new trial,
and conclude with a determination whether a new trial or j.m.l.
could have been granted on any other ground and thus rescue the
court's ruling from reversal.

---

[1]  "Subject to the foregoing Motion for Judgment as a Matter
of Law, Defendant files this Motion for New Trial in the above
referenced case.  Pursuant to Rule 59 of the Fed.R.Civ.P.,
Defendant Wilson moves for a new trial in this matter on all issues
tried before the jury."

[2]  "No later than 10 days after entry of judgment the court,
on its own, may order a new trial for any reason that would justify
granting one on a party's motion."  Fed.R.Civ.P. 59(d).

B.    <u>Proceedings in the First Trial</u>

Peterson filed this suit in district court under 42 U.S.C. §§ 1983 and 1988, as well as the First, Fifth, and Fourteenth Amendments of the United States Constitution after he was fired as grant director at Texas Southern University (TSU).  He claims that his property interest in his employment at TSU was damaged or destroyed when it was arbitrarily and capriciously terminated.  In addition to Wilson, Peterson named Llayron L. Clarkson, James Race, and William H. Harris, individually, and the Board of Regents of TSU, as defendants in his August 1991 complaint.  By the time that Peterson's case finally went to trial, however, TSU had been dismissed as a defendant, Peterson's claims against Clarkson, Race, and Harris had been dismissed, and all his claims against Wilson (with the exception of the substantive due process claim under § 1988 and the several amendments to the Constitution) had been dismissed as well.  After five days of trial, conducted by the magistrate judge with the consent of the parties, the jury found for Peterson and awarded him $152,235 for lost pay and benefits and $35,000 for past and future mental anguish.  Following the verdict, Wilson renewed his motion for j.m.l. and supplemented it with his bare-bones alternative motion for a new trial.

Some four months later, in January 1996, the district court granted the new trial, ostensibly in response to Wilson's motion, but in actuality on its own motion:  The substantive language of the district court's order granting a new trial eschews any conclusion other than that the ruling was granted <u>sua</u> <u>sponte</u>, and

4

that it was not granted for insufficiency of the evidence or because the jury verdict was against the great weight of the evidence, but rather for the following reason:

> The court concludes, based on the jury's verdict and comments the jurors made to the court after returning the verdict [and outside the presence of the parties and their respective counsel], that the jury completely disregarded the Court's instructions. Instead, it appears that the jury considered improper factors in reaching its verdict. Accordingly, the Court deems it in the interest of justice to grant a new trial (emphasis added).

This ruling not only dispels Wilson's contention that the court found the jury's verdict to be against the great weight of the evidence or lacking in evidence sufficient to support the verdict; it demonstrates beyond cavil that the court met with and interrogated the jurors after the verdict (concededly, outside the presence of the parties and counsel), and then acted on the comments of some of the jurors as though their remarks were newly discovered evidence. The inference is inescapable that, to impeach the jury's verdict, the district court relied on information gleaned from the jurors themselves during the court's post-verdict, ex parte meeting with the jury. The court voided the verdict because, in the court's own words, the jury "completely disregarded the Court's instructions." Indeed, the above-quoted language of the court's order is preceded immediately by its citation to our key "newly discovered evidence" opinion regarding new trials.[3]

Peterson timely filed a motion for reconsideration, which the

---

[3] Government Fin. Serv. One Ltd. Partnership v. Peyton Place, Inc., 62 F.3d 767 (5th Cir. 1995).

district court did not grant.  The case was re-tried in June 1996, and ended in a jury verdict in favor of Wilson, rejecting Peterson's claims.  Peterson timely filed the notice of appeal that places the case before us today, but Wilson did not cross-appeal.

C.    Facts

The jury, as the finder of facts and the maker of all credibility calls, reached its verdict in the first trial on the basis of the following record facts and inferences.

Peterson is well educated, well trained, and widely experienced in his field of concentration, which is grant administration for institutions of higher education.[4]  When Peterson joined TSU in 1983 he assumed responsibility for administering grants, principally Title III grants.  In addition, he was in charge of student affairs and was responsible for determining the residency status of foreign students.[5]  Peterson also supervised finances of the university and was in charge of Institutional Research.  As Title III Director, Peterson generally reported directly to the Vice President for Academic Affairs: first

---

[4]  Peterson received a Ph.D. in Development and Planning from Ohio State University, was certified by that institution as a "grant administrator," participated in post-doctoral study in Management at Harvard University and Georgetown University, and investigated problems experienced by colleges and universities in connection with receipt of grants for the National Institute of Education (NIE).  In addition to consulting for the United States Department of Education, Peterson held jobs as Director of Title III (federal grants to educational institutions with predominantly minority or foreign student enrollments) at Wilberforce University in Ohio and Kentucky State University.

[5]  At that time TSU's foreign student enrollment was the largest in the nation.

Clarkson, then Moore, and eventually, Wilson.[6]   The programs supported by Title III grants included faculty development, equipment purchases, and institutional research, providing millions of dollars annually for expenditures at TSU.

Wilson expressly acknowledged that Peterson's employment at TSU was controlled by the Staff Manual.  Wilson corroborated the testimony of TSU President Harris that Peterson's employment could only be terminated for cause.  In fact, in his January 3, 1991, termination letter to Peterson, Wilson stated that if Peterson's "proposed termination" was determined to be without cause, he would be fully reinstated with back pay.

Without reiterating every detail of the relevant testimony and documents, it suffices that the evidence heard and obviously credited by the jury painted a picture of Peterson as a highly principled, apolitical, objective grant administrator who repeatedly refused to "play ball" with high ranking TSU administrators when they attempted to obtain expensive equipment for unauthorized personal use or sought to have unauthorized job positions created and funded with grant money for their special "friends."[7]  The jury also heard and obviously credited testimony of both direct and implied threats by Wilson of adverse job

_____

[6]  TSU had several different presidents during the course of Peterson's tenure:  Leonard Spearman; William Harris; and E. O. Bell.

[7]  While Peterson served under Wilson (June 1990 - January 1991), Peterson refused Wilson's requests for, inter alia, (1) a camera, TV monitor, and VCR for his personal use, and (2) Title III funding to create secretary/receptionist positions in Wilson's office for two of his "lady friends."

7

actions, including firing, that Peterson was in jeopardy of incurring if, on reflection, he should fail or refuse to accede to requests that would require the unauthorized expenditure of grant funds.

The termination letter of January 3, 1991, from Wilson to Peterson purported to outline nine items constituting "cause" for the firing, each of which was set forth in a report prepared and submitted on request by one Joyce Deyon with whom, it turned out, Wilson never conferred after receiving the report. Wilson testified that he accepted the report and made his judgment based on it. The jury heard testimony and saw documents which, if believed —— as the jury apparently did —— methodically refuted or explained away each of the nine purported causes for termination and revealed that Wilson did not even understand some of the items. The jury also heard evidence which, if credited, was sufficient to support a conclusion that the termination and its purported causes were pretext intended to cover Wilson's retaliation and desire to accomplish his actual or implied threats of getting rid of Peterson and replacing him with a grant director who would be more of a team player, i.e., would be more amenable to funding equipment purchases and job creations for "friends" of the higher-ups in the TSU administration with grant money.

That the jury unquestionably credited the testimony and documentation supporting Peterson's version of the facts and rejected Wilson's is confirmed by the "Yes" answer to Interrogatory No. I-A, "Do you find from a preponderance of the evidence that Dr.

8

Bobby Wilson acted arbitrarily and capriciously in terminating Dr. Peterson?" In the interrogatory that followed, the jury awarded Peterson $152,235 in lost pay and benefits, and $35,000 for past and future mental anguish.

## II

## ANALYSIS

### A. Standard of Review

We review the district court's grant of a new trial for abuse of discretion.[8] "It is a well-settled rule in this circuit that `a verdict can be against the "great weight of the evidence," and thus justify a new trial, even if there is substantial evidence to support it.'"[9] What courts cannot do — and what the district court here never purported to do — is to grant a new trial "simply because [the court] would have come to a different conclusion then the jury did."[10]

### B. The District Court's Ruling

The district court's succinct but cryptic, three-sentence explanation for granting a new trial demonstrates beyond question that, following the verdict, the court impermissibly met with and interrogated the jurors <u>outside the presence of the parties and their respective counsel</u>, and then proceeded to act in direct

---

[8]  <u>Peyton Place</u>, 62 F.3d at 774 (citing <u>United States v. Flores</u>, 981 F.2d 231, 237 (5th Cir. 1993)).

[9]  <u>Rousseau v. Teledyne Movible Offshore, Inc.</u>, 812 F.2d 971, 972 (5th Cir.) (<u>citing Shows v. Jamison Bedding, Inc.</u>, 671 F.2d 927, 930 (5th Cir. 1982)), <u>cert. denied</u>, 484 U.S. 827, 108 S. Ct. 95, 98 L. Ed. 2d 56 (1987).

[10]  25 Fed. Proc., L. Ed. § 58.13 (1984).

reliance on the jurors' comments as though they constituted newly discovered evidence of a kind that the court could properly consider. It was not. The conclusion is inescapable that, in impeaching the jury's verdict in this case, the district court relied on information obtained from the jurors in the court's post-verdict, <u>ex</u> <u>parte</u> meeting with them <u>and</u> that, by definition, any information thus obtained had to come directly from their internal deliberations qua jurors.[11]

1.   <u>Jury Impeachment</u>

Rule 606(b) of the Federal Rules of Evidence (F.R.E.) tightly controls impeachment of jury verdicts. This rule states, in pertinent part:

> Upon an inquiry into the validity of a verdict . . ., a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict . . . or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether

---

[11]   We find it perplexing that the statement in the court's conclusional ruling to the effect that the jury "completely disregarded the Court's instructions" is not supported by any explanation of (1) precisely which instructions were disregarded by the jury and how; (2) precisely what "comments the jurors made" that led the court to conclude that its instructions had been disregarded; (3) precisely what "improper factors" the jury considered in its deliberations; or (4) precisely what "interest of justice" was so trampled by the jury's verdict that it had to be scrapped. Without considerably more, such a bare, enigmatic platitude can never provide the kind of support needed by an appellate court if it is to conclude that a trial court — particularly one that has presided over the pre-trial proceedings, motion practice, and full-blown jury trial of a civil case, has denied motions for a j.m.l., has met with the jury after the verdict out of the presence of counsel, and has then granted a new trial — exercised its discretion at all, much less did so without abusing it.

10

extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.[12]

Wilson does not contest Peterson's assertion that the trial court met with the jury after the verdict, off the record and outside the presence of counsel. We agree with Peterson that — with the possible exception of an instance in which the court's professional curiosity has been piqued but on which no subsequent action is taken by the court — such a meeting is highly irregular if not absolutely impermissible, and, more importantly, that impeachment of the jury verdict on the basis of information obtained in such a discussion constitutes abuse of discretion per se.

The landmark Supreme Court case on this issue is Tanner v. United States.[13] After acknowledging that "[b]y the beginning of this century, if not earlier, the near-universal and firmly established common-law rule in the United States flatly prohibited the admission of juror testimony to impeach a jury verdict,"[14] the Court observed that "Federal Rule of Evidence 606(b) is grounded in the common-law rule against admission of jury testimony to impeach a verdict and the exception for juror testimony relating to

---

[12] Fed. R. Evid. 606(b).

[13] 483 U.S. 107, 107 S. Ct. 2739, 97 L. Ed. 2d 90 (1987).

[14] Id. at 117, 107 S. Ct. at 2745.

11

extraneous influences."[15]  Following <u>Tanner</u>, and more closely on point, we held in <u>Robles v. Exxon Corp.</u>[16] that receiving testimony from the jurors after they have returned their verdict, for the purpose of ascertaining that the jury misunderstood its instructions, is absolutely prohibited by F.R.E. 606(b).[17]  We underscored that holding by noting that "the legislative history of the rule unmistakably points to the conclusion that Congress made a conscious decision to disallow juror testimony as to the jurors' mental processes or <u>fidelity to the court's instructions</u>."[18]  What is pellucid here, from the court's own unequivocal and unambiguous words, is that the jurors' statements to the court related directly to matters that transpired in the jury room, that these matters comprehended the mental processes of the jurors in their deliberations on the case, and that the jurors' statements formed the foundation of the court's impeachment of the verdict grounded in the jury's lack of "fidelity to the court's instructions."[19]  We cannot conceive of an example more explicitly violative of <u>Robles</u>.

2.   <u>Great Weight of the Evidence</u>

As the bald "interest of justice" reason given by the district court, impermissibly grounded in the jury's purported disregard of

---

[15]   <u>Id.</u> at 121, 107 S. Ct. at 2748.

[16]   <u>Robles v. Exxon Corp.</u>, 862 F.2d 1201 (5th Cir.), <u>cert. denied</u>, 490 U.S. 1051, 109 S. Ct. 1967, 104 L. Ed. 2d 434 (1989).

[17]   <u>Id.</u> at 1204.

[18]   <u>Id.</u> at 1205 (emphasis added).

[19]   <u>Id.</u>

12

the court's instructions, cannot sustain the order granting a new trial, reversal can only be avoided if we determine that the order itself can be affirmed on appeal for reasons other than those proffered by the trial court. Of the alternative reasons for granting a new trial, only a determination that the verdict is against the great weight of the evidence is viable here; clearly, the record and the applicable law demonstrate that a j.m.l. could not have been granted. So, for the trial court's abuse of discretion to be harmless and its order of a new trial to be sustained, we would have to conclude that, viewing all the evidence in the light most favorable to Peterson, the verdict is against the great weight of the evidence or the evidence is insufficient to support the verdict. The instant record cannot support any such conclusion.

The district court's explanation for granting a new trial expressly refutes the wholly unsupported statement in Wilson's appellate brief that the trial court found the jury's verdict to be against the great weight of the evidence (or lacking in evidence sufficient to support the verdict). No conceivable reading of the court's ruling permits such a conclusion. As that ruling makes no mention of the merits of the case or the evidence considered by the jury, we have had to conduct the kind of exercise that we are compelled to engage in when motions for summary judgments for qualified immunity are denied because a genuine dispute of material fact exists, but the district court fails to specify its factual assumptions for the record: Here, as in those instances, we had to

13

"'undertake a cumbersome review of the record. . . .'"[20]

As noted above, the jury in this case was presented with extensive evidence, principally testimonial evidence, much of which was in direct conflict, i.e., a "swearing match." Classically, the jury had the opportunity to view the witnesses' demeanor, look them in the eye, observe their body language, hear the timbre of their voices, and, finally, exercise the ultimate responsibility of the finder of fact by making credibility calls and deciding whom to believe and whom to disbelieve. We have now conducted the obligatory "cumbersome review" of the multi-volume trial record and find that both sides of the case —— Peterson's and Wilson's —— are supported by substantial evidence. One thing that is palpably absent from the record of the first trial, however, is a "great weight of evidence" either way. Indeed, we speculate that if there had been, the district court would have granted a new trial expressly on that ground and would never have resorted to that amorphous, will-of-the-wisp that we call "interest of justice.[21]

---

[20] Coleman v. Houston Indep. Sch. Dist., 113 F.3d 528, 531-32 (5th Cir. 1997) (quoting Johnson v. Jones, 515 U.S. 304, 319, 115 S. Ct. 2151, 2159, 132 L. Ed. 2d 238 (1995)).

[21] In apparent desperation, Wilson on appeal also seeks to support the district court's grant of a new trial by urging that a j.m.l. in his favor would have been appropriate on the basis of qualified immunity. But not only did the case proceed through a full merits jury trial, thereby negating the principal purposes of qualified immunity; Wilson failed to cross appeal and thus forfeited his right to assert such an alternative ground. "[W]ithout the filing of a cross-appeal, an appellee 'may not attack the decree with a view either to enlarging his own rights thereunder or of lessening the rights of his adversary, whether what he seeks is to correct an error or to supplement the decree with respect to a matter not dealt with below.'" Miller v. Butcher Distribs., 89 F.3d 265, 267 (5th Cir. 1996) (citing Robichaux v.

14

Because our review of the entire record of the first trial eschews any possibility that the jury verdict was against the great weight of the evidence, or that the evidence is insufficient to support Peterson's claims, this ground cannot serve as a substitute basis for affirming the district court's grant of a new trial. It follows inescapably, then, that the court's abuse of discretion in violating F.R.E. 606(b) and of our rule in Robles, grounded in the Supreme Court's pronouncements in Tanner, was not harmless error. Rather, it was reversible error.

## III

## CONCLUSION

Our meticulous review of the record of the first trial of this case and our parsing of the ruling of the district court in granting a new trial satisfy us that such ruling must be reversed and a judgment must be rendered on the basis of the original jury verdict in favor of Peterson. The operable language of the district court's ruling dispels any doubt that the court purported to grant a new trial "in the interest of justice" and did so as a direct result of its impermissible post-trial colloquy with the jurors, in direct violation of Rule 606(b) of the F.R.E. and

---

Radcliff Material, Inc., 697 F.2d 662, 668 (5th Cir. 1983) (quoting Morley Constr. Co. v. Maryland Cas. Co., 300 U.S. 185, 191, 57 S. Ct. 325, 328, 81 L. Ed. 593 (1937)). Moreover, were we to consider Wilson's immunity claim at this post-trial, post-verdict late hour, we would see not only that Peterson's constitutional rights in his employment were clearly established before Wilson fired him, see, e.g., Russell v. Harrison, 736 F.2d 283, 288 (5th Cir. 1984); Honore v. Douglas, 833 F.2d 565 (5th Cir. 1987), but also that at all times there was, at a minimum, a genuine issue of material fact as to the objective reasonableness of Wilson's actions —— an issue resolved against Wilson by the jury.

15

likewise in violation of jurisprudential rules of this court and the Supreme Court that proscribe such an impeachment of the jury's verdict. That same language from the district court demonstrates that, despite words to the contrary, a new trial was granted <u>sua sponte</u> on grounds that can only be cubbyholed as "new evidence," not on the basis of Wilson's motion for a new trial expressly grounded in the contention that the verdict was against the great weight of the evidence or lacking in sufficient evidence.

Any effort to salvage the ruling of the district court is stymied by the record itself which reflects neither a "great weight" of evidence in favor of either party, nor a basis on which the trial court could have granted a j.m.l. Rather, it contains more than sufficient evidence, when credited by the jury, to support the determination that Peterson's termination by Wilson was arbitrary and capricious, in direct retaliation for Peterson's refusal to authorize the expenditure of federal grant funds for improper or illicit purposes. The evidence obviously credited by the jury also supports a finding of pretext, as the nine items listed in the Deyon report evaporate when exposed to the spotlight of credible explanations, including the revelation that Wilson never conferred with the author of the report and did not even fully understand some of the unsustainable charges in this "hatchet job" on which he so readily relied. The firing thus violated Peterson's substantive due process property right in his employment at TSU, which could only be terminated for cause.

We are thus left with no choice but to reverse the district

16

court's grant of a new trial, vacate the court's judgment rendered on the basis of the jury verdict in the second trial, and reinstate the results of the first trial. We therefore remand this case to the district court for entry of judgment in favor of Peterson and against Wilson in the principal sum of $187,235 ($152,235 for lost pay and benefits and $35,000 for past and future mental anguish), and for the assessment of appropriate interest and costs, including reasonable attorneys' fees incurred by Peterson in both trials and on appeal.

REVERSED and REMANDED with instructions.