**Opinion Dated July 15, 2015 is Withdrawn, Petition for Writ of Mandamus Conditionally Granted, Motion for Rehearing En Banc Denied as Moot, and Opinion on Rehearing filed October 1, 2015.**



In The

# Fourteenth Court of Appeals

## NO. 14-15-00143-CV

## IN RE MARK ATHANS, OMAR MARTINEZ, AND PRESTIGE SURGICAL ASSISTANTS, LLC, Relators

**ORIGINAL PROCEEDING**
**WRIT OF MANDAMUS**
**80th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2013-05129**

## OPINION  O N  R E H E A R I N G[1]

Relators Mark Athans, Omar Martinez, and Prestige Surgical Assistants, LLC (collectively the "Prestige Parties") have filed a petition for writ of mandamus in this court. *See* Tex. Gov't Code Ann. § 22.221 (West 2004); *see also*

---

[1]We issued our original opinion on July 15, 2015. Real party in interest American Surgical Assistants, Inc. d/b/a American Surgical Professionals filed a motion for rehearing. We overrule the motion for rehearing, withdraw our prior opinion, issue this opinion on rehearing, and deny the motion for rehearing en banc as moot.

Tex. R. App. P. 52. The Prestige Parties ask this court to compel the Honorable Larry Weiman, presiding judge of the 80th District Court of Harris County, to set aside an order granting the motion for new trial filed by real party in interest American Surgical Assistants, Inc. d/b/a American Surgical Professionals. We conditionally grant the petition.

## I. BACKGROUND

This case involves allegations by American Surgical Assistants, Inc. d/b/a American Surgical Professionals ("ASA"), a company that provides surgical-assisting services, that two of its former employees, while still employed by ASA, solicited other employees to leave ASA to work for another surgical-assisting company, Prestige Surgical Assistants, LLC.

Omar Martinez was an ASA employee. He and Boyd Yarbrough lived in the same neighborhood. In 2012, the two met at a birthday party at Martinez's home. In conversation, Martinez told Yarbrough that he was a surgical assistant. Yarbrough disclosed that he was involved in ambulatory surgical centers. When Yarbrough asked Martinez why he did not go out on his own, Martinez responded that he did not have the funds to make such a move. Yarbrough informed Martinez that he could provide financial backing for a new surgical-assisting company. Martinez and Yarbrough spoke again in August or September 2012 about starting an entity to provide surgical-assisting services. Their discussions ultimately led to their formation of a new company.

2

### Formation of a New Company

The plan was for Yarbrough's company, Elite Ambulatory Surgery Centers, LLC, to provide the funds for the new entity and for Martinez to manage the day-to-day operations. The plan depended on Martinez's finding surgical assistants to work for the new entity. Yarbrough agreed to Martinez's salary request of $250,000 a year. The new company, Prestige Surgical Assistants, LLC, was incorporated shortly thereafter. About two weeks later, Prestige hosted a meeting for surgical assistants to learn more about the new venture. Attendees included three other ASA surgical assistants: Mark Athans, Monica Ellington, and Eleazar Flores.

Athans found out about the opportunity with Yarbrough from Martinez; Ellington and Flores learned of it from Athans. The four ASA employees—Athans, Martinez, Ellington, and Flores—turned in their letters of resignation from ASA three days later, effective November 30, 2012. Shortly after that, Flores changed his mind and stayed at ASA. By early December 2012, Athans, Martinez, and Ellington (collectively, the "Former Employees") were assisting in operations on behalf of Prestige. Martinez owns fourteen percent of Prestige, Athans owns five percent, and Ellington owns one percent.

### The Former Employees' Activities

Athans, Ellington, and Flores were ASA's primary surgical assistants at Memorial Hermann The Woodlands Hospital (the "Hospital"). They had established relationships with the doctors at the Hospital, and ASA had relied on those relationships to develop business at the Hospital. ASA had exclusive

contracts with certain facilities, but not with the Hospital. Athans and Ellington continued to assist at the Hospital for Prestige. ASA handled only a few cases at the Hospital after Athans and Ellington left ASA.

### *Litigation*

ASA sued the Former Employees for breaching the covenants not to compete contained in their respective employment agreements with ASA by offering surgical-assistant services at an "ASA client institution"—the Hospital—on behalf of Prestige. ASA also alleged that the Former Employees breached their respective fiduciary duties: (1) when they agreed to work for Prestige while still employed at ASA and when they agreed that Prestige would provide surgical-assistant services at the Hospital; and (2) when Martinez and Athans solicited ASA employees to work for Prestige while both were still employees of ASA. ASA also sued the Former Employees for aiding and abetting one another in breaching their respective fiduciary duties.

ASA sued Prestige for tortiously interfering with the Former Employees' respective employment agreements with ASA and for aiding and abetting the Former Employees. ASA sought punitive damages and disgorgement of all the defendants' past and future profits or benefits, which were derived primarily from the work Athans and Ellington performed at the Hospital.

The day before trial, ASA nonsuited all its claims against Ellington and its claims for breach of contract against Athans and Martinez. ASA proceeded on its claims for breach of fiduciary duty against Athans and Martinez and its claim

4

against Prestige for aiding and abetting Martinez and Athans in the breach of their fiduciary duties.

### *The Jury's Verdict*

The jury answered "no" when asked whether Athans and Martinez had failed to comply with their fiduciary duties by soliciting other ASA employees while still working for ASA. Because of the jury's answers as to Athans and Martinez, it was not necessary for the jury to answer the remaining questions in the charge as to Prestige's liability.

ASA filed a motion for judgment notwithstanding the verdict and for new trial. In support of its motion for new trial, ASA argued that (1) the jury's failures to find that Athans and Martinez had breached their fiduciary duties were against the overwhelming weight of the evidence; and (2) the probability that the Prestige Parties' counsel's improper, incurable jury argument during closing on the meaning of the term "solicit" caused harm to ASA was greater than the probability that the jury's answers to Athans's and Martinez's liability were grounded on the proper proceedings and evidence.

### *Order Granting New Trial*

The trial court held a hearing on ASA's motion for judgment notwithstanding the verdict and motion for new trial and later granted ASA's motion for new trial. The respondent's order granting a new trial reads in its entirety as follows:

ON THIS DAY, the Court came to consider Plaintiff American Surgical Assistants, Inc[.] d/b/a American Surgical Professionals' ("ASA"), Motion for New Trial. For the following reasons, Plaintiffs' motion IS GRANTED[:]

The Court finds that the jury's answers to issue number one (1) submitted in the Court's charge to the jury was [sic] against the great weight and preponderance of the evidence so as to be manifestly unjust. The testimony of witnesses Mark Athans, Monica Ellington, Omar Martinez, and Eleazar Flores established that Omar Martinez and Mark Athans asked Monica Ellington and Eleazar Flores to terminate their employment with ASA in order to start working for Prestige Surgical Associates, LLC, during the time that all four witnesses were still employed by ASA[.] There was no controverting evidence as to this issue of fact[.]

Further, issue number one (1) posed to the jury required the jury to apply its own understanding of the meaning of the word "solicit." Several different definitions of the meaning of the word "solicit" were argued to the jury during closing argument. The multiplicity of definitions confused the jury[.] The Court finds the meaning of the word "solicit" is a question of law and should not have been resolved by the jury as a finding of fact. Additionally, common dictionary definitions of the word "solicit" contain a diverse array of meaning[s] for this term, some of which involve criminal implications and some that are innocuous. Accordingly, the jury's answers to issue number one (1) were against the great weight and preponderance of the evidence so as to be manifestly unjust.

Further, Defense counsel violated the Court's instructions not to discuss the details of the evidence or argue the case at the voir dire stage. Plaintiff had no opportunity to conduct additional questioning during voir dire to determine the effect these comments may have had on potential jurors. These violations contributed to the rendition of an improper verdict by influencing the jury to return a verdict it probably would not otherwise have returned.

6

Accordingly, it is ORDERED that Plaintiff's motion for new trial is GRANTED and that the jury's verdict be set aside[.] The Clerk of the Court is directed to reinstate this cause on the jury docket.

## *Mandamus*

Following our denial without prejudice of a previous mandamus petition because the mandamus record did not contain all of the trial evidence,[2] the Prestige Parties initiated this second mandamus proceeding, seeking to compel the trial court to set aside its new-trial order.

## II. MANDAMUS STANDARD OF REVIEW

To be entitled to mandamus relief, a relator generally must demonstrate (1) the trial court clearly abused its discretion; and (2) the relator has no adequate remedy by appeal. *In re Reece*, 341 S.W.3d 360, 364 (Tex. 2011) (orig. proceeding). A trial court clearly abuses its discretion if it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law or if it clearly fails to analyze the law correctly or apply the law correctly to the facts. *In re Cerberus Capital Mgmt. L.P.*, 164 S.W.3d 379, 382 (Tex. 2005) (orig. proceeding) (per curiam). "In determining whether the trial court abused its discretion with respect to resolution of factual matters, we may not substitute our judgment for that of the trial court and may not disturb the trial court's decision unless it is shown to be arbitrary and unreasonable." *In re Sanders*, 153 S.W.3d 54, 56 (Tex. 2004) (orig. proceeding) (per curiam). In other words, under an

---

[2] *See In re Athans*, 458 S.W.3d 675, 676–79 (Tex. App.—Houston [14th Dist.] 2015, orig. proceeding).

7

abuse-of-discretion standard, we defer to the trial court's factual determinations if they are supported by the evidence, but we review the trial court's legal determinations de novo. *In re Labatt Food Serv., L.P.*, 279 S.W.3d 640, 643 (Tex. 2009) (orig. proceeding). A trial court's order granting a new trial may be reviewed by an appellate court in a mandamus proceeding. *See In re Toyota Motor Sales, USA, Inc.*, 407 S.W.3d 746, 757–58 (Tex. 2013) (orig. proceeding); *In re United Scaffolding, Inc.*, 377 S.W.3d 685, 688–89 (Tex. 2012) (orig. proceeding).

## III. REQUIREMENTS FOR A NEW-TRIAL ORDER

Texas trial courts historically have enjoyed broad discretion in granting new trials. *In re Columbia Med. Ctr. of Las Colinas, Subsidiary, L.P.*, 290 S.W.3d 204, 210 (Tex. 2009) (orig. proceeding). But, that discretion is not without limits. *See id*. A trial court granting a motion for new trial must provide an understandable, reasonably specific explanation of the court's reasons for setting aside the jury's verdict. *See Toyota Motor Sales, USA, Inc.*, 407 S.W.3d at 757; *Columbia Med. Ctr.*, 290 S.W.3d at 213. A trial court granting a motion for new trial should state one or more reasons for granting a new trial that are both legally appropriate and specific enough to indicate that the trial court did not simply parrot a pro forma template, but rather derived the articulated reasons from the particular facts and circumstances of the case at hand. *See Toyota Motor Sales, USA, Inc.*, 407 S.W.3d at 757; *United Scaffolding, Inc.*, 377 S.W.3d at 688–89. A reviewing court may scrutinize new-trial orders to ensure compliance with these requirements, and it also may review the correctness or validity of the trial court's reasons for granting a new trial in the context of a mandamus proceeding. *See Toyota Motor*

8

*Sales, USA, Inc.*, 407 S.W.3d at 757–58.  A trial court's articulated reasons for granting a new trial must be supported by the underlying record; if not, the new-trial order will not survive mandamus review.  *See id.* at 758.

### IV. FACTUAL SUFFICIENCY OF THE EVIDENCE

The Prestige Parties assert the trial court abused its discretion by finding that the jury's answer to question number one was against the great weight and preponderance of the evidence so as to be manifestly unjust.  As to this basis for the trial court's new-trial order, we conclude that the trial court provided an understandable, reasonably specific explanation of the court's reason for setting aside the jury's verdict.  *See Toyota Motor Sales, USA, Inc.*, 407 S.W.3d at 757; *Columbia Med. Ctr.*, 290 S.W.3d at 213; *In re Wyatt Field Serv. Co.*, 454 S.W.3d 145, 155−56 (Tex. App.—Houston [14th Dist.] 2014, orig. proceeding [mand. denied]).  The reason for granting a new trial is legally appropriate and specific enough to indicate that the trial court did not simply parrot a pro forma template, but rather derived the articulated reason from the particular facts and circumstances.  *See Toyota Motor Sales, USA, Inc.*, 407 S.W.3d at 757; *United Scaffolding, Inc.*, 377 S.W.3d at 688–89; *Wyatt Field Serv. Co.*, 454 S.W.3d at 155−56.

Having made these determinations, we now consider whether the trial court correctly concluded the trial evidence is factually insufficient to support the jury's answer to question number one.  *See Toyota Motor Sales, USA, Inc.*, 407 S.W.3d at 757–58.  We analyze this issue under the factual-sufficiency standard of review.

*See Wyatt Field Service Co.*, 454 S.W.3d at152−53; *In re Zimmer, Inc.*, 451 S.W.3d 893, 905 (Tex. App.—Dallas 2014, orig. proceeding).

In a factual-sufficiency review, we examine the entire record, considering both the evidence in favor of, and contrary to, the challenged finding. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex. 1998). When a party attacks the factual sufficiency of an adverse finding on an issue on which the party had the burden of proof, the party must demonstrate that the adverse finding is against the great weight and preponderance of the evidence. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (per curiam). A reviewing court considers and weighs all the evidence, and it is proper to set aside the jury finding only if the finding is so contrary to the overwhelming weight of the evidence that the finding is clearly wrong and unjust. *See Columbia Med. Ctr.*, 290 S.W.3d at 213; *Maritime Overseas Corp.*, 971 S.W.2d at 406–07.

The jury is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). When presented with conflicting testimony, the jury may believe one witness and disbelieve others, and it may resolve inconsistencies in the testimony of any witness. *See McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986). Neither the trial court nor this court may substitute its own judgment for that of the jury, even if the court would reach a different answer on the evidence. *See United Scaffolding, Inc.*, 377 S.W.3d at 688; *Maritime Overseas Corp.*, 971 S.W.2d at 407. The amount of evidence necessary to show that factually sufficient evidence supports a jury finding is far less than the amount of

evidence necessary to justify a conclusion that the finding is so contrary to the overwhelming weight of the evidence so as to be clearly wrong and unjust. *See GTE Mobilnet of S. Tex. v. Pascouet*, 61 S.W.3d 599, 615–16 (Tex. App.—Houston [14th Dist.] 2001, pet. denied).

Question number one reads in its entirety as follows:

> Did Athans and/or Martinez fail to comply with their fiduciary duties to ASA?
>
> While they were ASA's employees, Athans and Martinez owed ASA **the fiduciary duty to not solicit** the departure of other ASA employees while still working for ASA.
>
> Under Texas law, an at-will employee may properly plan to go into competition with his employer and may take active steps to do so while still employed. Such an employee has no general duty to disclose his plans to his employer.[3]

The jury answered "no" for Athans and for Martinez. The record reflects that no party objected at trial to the form of question number one or to the trial court's failure to provide a definition of the word "solicit." Therefore, the factual sufficiency of the evidence is measured using the language of the charge given, regardless of whether the charge correctly states Texas law.[4] *See Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000); *Houston Poly Bag I, Ltd. v. Kujanek*, 370 S.W.3d 82, 88 (Tex. App.—Houston [14th Dist.] 2012, no pet.).

---

[3]Emphasis added.

[4]Accordingly, there is no issue before this court as to the scope of the fiduciary duty owed by Athans or Martinez to ASA.

11

The charge indicated to the jury that if a word was used in the charge in a way that was different from its ordinary meaning, the trial court would provide a proper legal definition. The term "solicit" was not defined in the jury charge. Accordingly, we are to measure the sufficiency of the evidence supporting the jury's answer to question number one based upon the commonly understood meaning of the term "solicit." *See Barnhart v. Morales*, 459S.W.3d733, 745 (Tex. App.—Houston [14th Dist.] 2015, no pet.). In the context of this case, the commonly understood meaning of the term "solicit" is "to make petition to: ENTREAT, IMPORTUNE, CONCERN"; "to approach with a request or a plea (as in selling or begging)"; "to move to action: serve as an urge or incentive: INCITE"; "to strongly urge (as one's cause or point): insist upon"; "to endeavor to obtain by asking or pleading"; and "to seek eagerly or actively." WEBSTER'S THIRD NEW INT'L DICTIONARY 2169 (1993).[5] ASA contends that "solicit" means merely "to ask." And, in the second paragraph of the new-trial order, the trial court implicitly concludes that the commonly understood meaning of "solicit" is

---

[5]Black's Law Dictionary similarly defines "solicit" as:

> To appeal for something; to apply to for obtaining something; to ask earnestly; to ask for the purpose of receiving; to endeavor to obtain by asking or pleading; to entreat, implore, or importune; to make petition to; to plead for; to try to obtain; and though the word implies a serious request, it requires no particular degree of importunity, entreaty, imploration, or supplication. To awake or incite to action by acts or conduct intended to and calculated to incite the act of giving. The term implies personal petition and importunity addressed to a particular individual to do some particular thing.

BLACK'S LAW DICTIONARY 1392 (6th ed. 1990) (citations omitted).

12

"to ask." We conclude that, in this context, the commonly understood meaning of "solicit" includes more than merely to ask.[6]

In September 2012, Martinez gave Yarbrough a list of potential surgical assistants. Athans and Ellington were not on that list. Martinez testified that when he needed additional surgical assistants, he "asked just Mark Athans." Martinez testified that in October or November 2012, he shared his idea with Athans:

> I shared my project, my idea with Mark Athans. . . . : And I have just an idea, if you are interested in a new project, it's something that is coming up on the side, the American Surgical Assistant. But we're going to do it after we resign, we are going to go to work in hospitals that they don't have contract[s].

Martinez explained that ASA had been sold a year before he and the others terminated their employment, and there were a number of changes, including changes to the overtime schedule, and no one was "comfortable." Because of the

---

[6]In its motion for rehearing, ASA asserts that the commonly understood meaning of "solicit" in the context of this case is "to ask." ASA also argues that our conclusion as to the commonly understood meaning of this term in today's case will apply in all cases in which a statute contains the term "solicit" without any statutory definition, leading to absurd results. But, context controls meaning. In other words, the commonly understood meaning of a term depends upon the circumstances in which the term is used. *See* Tex. Gov't Code § 311.011(a) (West, Westlaw through 2015 R.S.) (stating that "[w]ords and phrases shall be read in context and construed according to the rules of grammar and common usage"); *Lubbock Cty. Water Control & Imp. Dist. v. Church & Akin, L.L.C.*, 442 S.W.3d 297, 306 (Tex. 2014) (noting that the word in question had many possible meanings depending on the context). ASA cites various statutes defining the elements of criminal offenses. Our conclusion regarding the commonly understood meaning of the term "solicit" does not mean this term has the same meaning in other contexts or other circumstances. *See* Tex. Gov't Code § 311.011(a); *Lubbock Cty. Water Control & Imp. Dist.*, 442 S.W.3d at 306.

conditions at ASA, Martinez "shared" his "project" with Athans. Martinez further explained:

> I was very careful because I didn't want to get in trouble. I just tell him, Mark, what about if you would have an opportunity to get in a different job, in a different, you know, job, different work that you are right now. If he say no, I'm happy here, I just stop right there, you know, I don't have to go farther. And he said, well it depends, you know, how things are changing here, I can't spend time with my life, all these that were mentioned. So I said okay. Next conversation — not on the same day — I say you know what, I have something that it could work for us. It's a project. We didn't know nothing about Prestige, it was money or not, who was going to be owners. I knew it was just [a] new project, new company in which we can have a better quality of life, a better salary, a better — be part of the company, which we never be part of the company in American Surgical Assistants, and where we can have a better quality of life. And he say, you know I'm interested. I said okay, well, we can talk later. But what I'm going to tell you, it's for me, I'm planning to leave the company.

Athans similarly testified that he learned from Martinez that Martinez was involved in starting a surgical-assisting project that ultimately became Prestige. According to Athans, Martinez told him there was a business opportunity and inquired as to whether Athans might be interested in joining the new venture.

Martinez set up a meeting between Athans and Yarbrough. Athans did not know the purpose of the meeting was to talk about whether he wanted to join the new venture, but he suspected it might be. On the day of the meeting, Yarbrough told Athans that he was involved with Martinez in starting a new surgical-assisting venture. Athans knew Yarbrough owned surgery centers, but he did not know

14

Yarbrough and Martinez were planning to start a company for surgical assisting. Yarbrough asked if Athans knew others who would be interested in joining. Athans testified that he probably responded that he did. Athans quoted a salary that it would take for him to join the new entity, but he did not say he was going to join.

Ellington and Flores learned of the opportunity that became Prestige from Athans. As to Ellington, Athans explained:

> I did not ask Monica. I told her about a possibility of something coming up. I didn't even make a decision to even go with Prestige after I made my resignation. I was leaving ASA. Whether I went with Prestige or not, I was going from ASA. Period.

According to Athans, he told Ellington about this possibility because Athans felt obligated to tell Ellington he was leaving ASA because he "felt responsible" for Ellington's having to take on the work that he would no longer be doing for ASA and because they were a team. Athans said he did not tell Ellington about this possibility because he wanted her to leave ASA to work for Prestige. Athans told Ellington there was a meeting, but he did not ask her to go; he hoped she understood that she was invited to the meeting and it was his intent that she attend. Athans also testified that he and Ellington had discussed going out on their own, working independently, but "backing each other up."

When asked about his understanding of the word "solicit," Athans testified:

> Solicit means to basically go forward, and like a car salesman, that's soliciting. [W]hen you walk up and go after somebody and try to get them and retain them on you, that like solicitation, I think. That's my definition and what my interpretation of it is. . . . I'm not trying to sell

them anything. [S]olicitation means you're trying to sell somebody something.

Under his interpretation of "solicit," Athans stated that he never solicited anyone to leave ASA. Even assuming that "to solicit" means "to ask someone seriously," Athans stated that he did not solicit Ellington or ask her seriously. Athans "just told her this is an opportunity that I'm looking at taking." Athans testified that he never told Ellington that she could make more money by going with the new opportunity.

Athans testified he did not know that Prestige actually existed when he submitted his letter of resignation on November 16, 2012. Nor did Athans know what he was going to do when he left ASA, but he had been planning to leave ASA all along. According to Athans, he did not decide to go to Prestige until November 26 or 27, 2012. Athans explained: "It was a big gamble, and it was scary for me to do that."

Ellington had known Athans before working for ASA. Ellington testified that Athans approached her about the possibility of leaving ASA for a new surgical-assisting company. Ellington stated that "[Athans] asked me if I was interested in a new opportunity, yes." Ellington explained:

Specifically we met just kind of in passing one day and he said that he may have an opportunity of a different company or possibility, and if I would be interested in something new and different, but he did not have specifics and he did not know longevity, he just said it sounds like it could be a good deal and wanted to know if I was interested. And I told him I would think about it.

16

They discussed the potential for Ellington to make more money at the new company. Ellington also would have the same schedule she had at ASA, "7 to 3, Monday through Friday."

Ellington was not "a hundred percent" sure that she would work for Prestige when she handed in her resignation letter. Because she was not the primary income-earner in her household, Ellington had "options" when she left ASA. Concerning the November 13, 2012 meeting, Ellington testified at one point that Athans told her about the meeting, but then also stated she was not sure it was Athans who told her about it. Ellington did not know for a fact that Athans would be going to work for a new company, but she knew he was leaning that way.

Flores learned of the opportunity with Prestige from Athans. Athans testified that he did not ask Flores to leave ASA for Prestige. According to Athans, Athans asked Flores whether it was true that he was leaving ASA; Flores told Athans he was leaving. Athans mentioned Prestige to Flores, but he did not ask Flores if he wanted to go to Prestige. Athans told Flores there was a business opportunity, but he did not say he was going to Prestige.

Flores testified that Athans presented the new venture in a conversation. Flores did not remember exactly what Athans had said, but described it as "[j]ust a new job opportunity, are you interested. We talked about it. Went to a meeting." Flores did not feel that Athans "was being real aggressive" with him. Flores would characterize Athans's approach as "saying hey, I've got some information about a new opportunity, are you interested[.]" Flores further stated that "[Athans] just simply came to me with a new or different job opportunity."

Athans told Flores that there was a financial backer for Prestige, which was important to Flores. Flores and Athans talked about how much Flores might make if he worked for Prestige, but they did not reach anything "concrete" about the amount of Flores's salary. Athans mentioned something "very superficially" about Flores's becoming an owner in the new company, but Flores did not receive any details. Athans told Flores that there would be an opportunity for Flores to make more money if he left ASA to work for Prestige.

At best, the evidence raises fact issues as to whether Martinez's actions amounted to presenting a new employment opportunity to Athans, merely asking Athans to leave ASA for Prestige, or seriously asking or inciting Athans to leave ASA for Prestige. Similarly, the evidence raises a fact issue as to whether Athans's actions constituted presenting a new employment opportunity to Ellington or Flores, merely asking Ellington to leave ASA for Prestige, or seriously asking or inciting Ellington into leaving ASA or Flores into submitting a letter of resignation.[7] It was the jury's duty to resolve any fact issues at trial, and the trial court may not substitute its judgment for that of the jury. *See United Scaffolding, Inc.*, 377 S.W.3d at 688; *Columbia Med. Ctr.*, 290 S.W.3d at 212.

In response to question number one, asking whether Martinez and Athans failed to comply with their fiduciary duties to ASA, the jury answered "no."

---

[7]As noted, ASA argued in its motion for new trial that the jury's finding that Martinez did not breach his fiduciary duty by asking Athans to leave ASA to work at Prestige was against the great weight and preponderance of the evidence. The trial court, however, did not grant the motion for new trial on this ground. Nonetheless, we address this ground in interest of judicial efficiency.

18

Under the applicable standard of review, we conclude that each of these answers is not so contrary to the overwhelming weight of the evidence that the finding is clearly wrong and unjust. *See In re Columbia Med. Ctr.*, 290 S.W.3d at 213; *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d at 406–07. Thus, to the extent the trial court granted a new trial on this ground, the record does not support this ruling, and the trial court abused its discretion in granting a new trial for this reason. *See Toyota Motor Sales, Inc.*, 407 S.W.3d at 758; *Wyatt Field Serv. Co.*, 454 S.W.3d at 149.

## V. ALLEGED CHARGE ERROR

In the third paragraph of the new-trial order, the trial court appears to address alleged error in the jury charge based on the failure of the trial court to define the term "solicit" in the charge.[8] We presume for the sake of argument that

---

[8]At the hearing on ASA's motion for new trial, the trial court indicated that a retrial was necessary so that a definition of "solicit" could be included in the jury charge:

> THE COURT: I will tell you that I believe in retrospect there should have been a definition that either the parties agreed on or the Court came up with based on — whether we used even an unabridged dictionary or something, that we agreed which term of solicit would apply. Because again, this has a range of criminal or innocuous definitions that I think would certainly reasonably cause confusion among the jury.

> \* \* \*

> THE COURT: . . . I believe it needs to be retried, and this time with a definition that is a — that would make it clear to the jury the definition when they're determining whether there was a solicitation or not. . . .

> \* \* \*

19

(1) the trial court provided an understandable, reasonably specific explanation of this reason for setting aside the jury's verdict; and (2) this reason for granting a new trial is specific enough to indicate that the trial court did not simply parrot a pro forma template, but rather derived the articulated reason from the particular facts and circumstances. *See In re Toyota Motor Sales, USA, Inc.*, 407 S.W.3d at 757; *United Scaffolding, Inc.*, 377 S.W.3d at 688–89; *Wyatt Field Serv. Co.*, 454 S.W.3d at 155−56.

The next question we must consider is whether it is correct or legally appropriate for a trial court to grant a new trial based on charge error when no party preserved that charge error for appellate review. Before the trial court submitted the charge to the jury, no party objected to the absence of a definition of "solicit" in the jury charge. Therefore, on appeal from a final judgment, no party could successfully claim that the trial court reversibly erred in failing to include a definition of this term in the charge. *See Cruz v. Andrews Restoration, Inc.*, 364 S.W.3d 817, 829 (Tex. 2012). In the context of a trial court's grant of a new trial, there is a question as to whether the same preservation-of-error rules apply.

In both federal court and in Texas criminal cases, preservation of error for appellate review as to a ground is not required in all cases for a trial court to grant a new trial as to that ground. *See U.S. v. Walton*, 909 F.2d 915, 924 (6th Cir. 1990)

---

I think in the Court's view, observing the jury, and after the jury's reaction, even afterwards when I spoke with them, my feeling was that there was mass confusion on that point, and they didn't really understand. And I don't think they were saying they didn't think the defendant did anything that they shouldn't have done or improper, the indication to me was that they were confused and didn't understand what they were supposed to be applying.

20

(stating, in civil case, that a new trial may be granted on grounds not called to the trial court's attention during trial if the error was so fundamental that a gross injustice would result absent a new trial); *State v. Hart*, 342 S.W.3d 659, 664–65 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd) (stating, in a criminal appeal from the grant of a new trial, that "there is no requirement that, before a trial court may grant a motion for new trial, the moving party must show that [the movant] has timely preserved [the] claim of error for appeal" but also stating that "trial courts lack the discretion to grant a new trial unless the defendant demonstrates that his first trial was seriously flawed and that the flaws adversely affected his substantial rights to a fair trial"). In addition, the Supreme Court of Texas has indicated in general that trial courts in civil cases have considerable discretion to grant a new trial and that the grounds upon which a trial court may properly grant a new trial are more expansive than the grounds that would support the reversal of a judgment on appeal. *See In re Columbia Med. Ctr.*, 290 S.W.3d at 211.

In any event, we need not decide the issue today. If the same preservation-of-error rules apply in this context, then ASA did not preserve error as to the claimed charge error, and this error is not a legally appropriate reason for the trial court to grant a new trial. *See Cruz*, 364 S.W.3d at 829. If the same preservation-of-error rules do not apply in this context, then we conclude that Texas courts would follow federal courts in concluding that a new trial will not be granted on grounds not called to the trial court's attention during the trial unless the error was so fundamental that a gross injustice would result absent a new trial. *See In re Toyota Motor Sales, USA, Inc.*, 407 S.W.3d at 758–59 (citing federal cases

reviewing trial court's grant of new trial); *see also Walton*, 909 F.2d at 924 (stating that a new trial will not be granted on grounds not called to the trial court's attention during the trial unless the error was so fundamental that gross injustice would result); 11 Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc. Civ.* § 2805 (3d ed.) (same as *Walton*).

The record does not reflect that any alleged error in the charge based on the failure of the trial court to define the term "solicit" was called to the trial court's attention during trial, and the record does not reveal any basis for concluding that any such error is so fundamental that a gross injustice would result unless a new trial is granted on this ground.[9] Thus, under either standard, to the extent the trial court granted a new trial on the charge-error ground, the reason for granting a new trial is not correct or legally appropriate, and the trial court abused its discretion in granting a new trial for this reason.[10] *See Toyota Motor Sales, Inc.*, 407 S.W.3d at 758; *United Scaffolding, Inc.*, 377 S.W.3d at 688–89.[11]

---

[9]ASA has argued that the trial court "made clear it wasn't going to submit a definition, but [the parties] could not argue anything other than asked." Nothing in the record indicates that the trial court had instructed the attorneys that they could not argue to the jury a definition of "solicit" meaning anything other than merely to "ask." Furthermore, the trial court did not state that it was granting a new trial based on any allegedly improper jury argument.

[10]At the hearing on ASA's motion for new trial, the trial court mentioned that it concluded the jury was confused regarding the meaning of the term "solicit" in part based on the trial court's discussions with the members of the jury after trial. The Prestige Parties argue that the trial court's post-trial discussions with the jury members is not a legally appropriate reason for granting a new trial. *See Peterson v. Wilson*, 141 F.3d 573, 577–79 (5th Cir. 1998) (holding that trial court abused its discretion by granting new trial based on post-trial comments made by jury members to the trial court regarding jury deliberations). But, the trial court did not mention its post-trial discussions with the jury in the new-trial order that it signed after the hearing, and we have concluded that the trial court abused its discretion in this regard, without having to address

22

## VI. STATEMENTS BY THE PRESTIGE PARTIES' COUNSEL DURING VOIR DIRE

In the fourth paragraph of the new-trial order, the trial court stated that it granted a new trial based on the Prestige Parties' counsel's violations of the trial court's instructions not to discuss the details of the evidence or argue the case during voir dire.[12] The trial court concluded that these violations contributed to the rendition of an improper verdict by influencing the jury to return a verdict it would not have otherwise returned.[13]

We presume for the sake of argument that (1) the trial court provided an understandable, reasonably specific explanation of this reason for setting aside the jury's verdict; (2) this reason for granting a new trial is specific enough to indicate that the trial court did not simply parrot a pro forma template, but rather derived the articulated reason from the particular facts and circumstances. *See Toyota Motor Sales, USA, Inc.*, 407 S.W.3d at 757; *United Scaffolding, Inc.*, 377 S.W.3d at 688–89; *Wyatt Field Serv. Co.*, 454 S.W.3d at 155−56.

---

this issue. Accordingly, we do not address the issue of the trial court's post-trial discussions with jury members.

[11] At the end of the third paragraph the trial court restates its conclusion that the jury's answers in response to question number one are against the great weight and preponderance of the evidence so as to be manifestly unjust. To the extent the third paragraph deals with factual insufficiency, we addressed this ground in the previous section.

[12] In granting a new trial for this reason, the trial court acted sua sponte. *See* Tex. R. Civ. P. 320. ASA did not raise this reason as a ground for a new trial in its motion for new trial or present any argument on this ground at the hearing on the motion for new trial.

[13] The trial court's purported instructions for conducting voir dire are not in the mandamus record, although the Prestige Parties agree that it is the standard practice of trial courts to instruct counsel about the parameters of voir dire before trial commences.

The record reflects that ASA did not object to any of the Prestige Parties' counsel's comments during voir dire. This lack of objection raises a question as to whether it is correct or legally appropriate for a trial court to grant a new trial based on comments during voir dire when no party preserved error as to these comments. Because ASA voiced no complaint during voir dire, on appeal from a final judgment in this case, ASA could not successfully claim that any of these comments constituted reversible error. *See Standard Fire Ins. Co. v. Reese*, 584 S.W.2d 835, 839 (Tex.1979); *Russell v. City of Bryan*, 919 S.W.2d 698, 708 (Tex. App.—Houston [14th Dist.] 1996, writ denied).

If the same preservation-of-error rules must be satisfied before a trial court may grant a new trial on this ground, then ASA did not preserve error as to any comments by the Prestige Parties' counsel during voir dire, and these comments are not a legally appropriate reason for the trial court to grant a new trial. *See Reese*, 584 S.W.2d at 839; *Russell*, 919 S.W.2d at 708. If the same preservation-of-error rules do not apply in this context, then we conclude that Texas courts would follow federal courts in determining that a new trial will not be granted on grounds not called to the trial court's attention during the trial unless the error is so fundamental that a gross injustice would result absent a new trial. *See In re Toyota Motor Sales, USA, Inc.*, 407 S.W.3d at 758–59; *Walton*, 909 F.2d at 924 (6th Cir. 1990); 11 Charles Alan Wright & Arthur R. Miller, *Fed. Prac.& Proc. Civ.* § 2805.

The record does not reflect that any alleged error based on comments by the Prestige Parties' counsel during voir dire was called to the trial court's attention during trial, and the record does not reveal any basis for concluding that any such

error is so fundamental that a gross injustice would result unless a new trial is granted on this ground. Thus, under either standard, to the extent the trial court granted a new trial on the basis of these comments, the reason for granting a new trial is not correct or legally appropriate, and the trial court abused its discretion in granting a new trial for this reason. *See Toyota Motor Sales, USA, Inc.*, 407 S.W.3d at 758; *United Scaffolding, Inc.*, 377 S.W.3d at 688–89.

## VII. CONCLUSION

We conclude that the trial court abused its discretion by granting a new trial and that the Prestige Parties do not have an adequate remedy by appeal. *See In re Toyota Motor Sales, USA, Inc.*, 407 S.W.3d at 762; *In re Columbia Med. Ctr.*, 290 S.W.3d at 209–10. Therefore, we conditionally grant the Prestige Parties' petition for writ of mandamus and order the trial court to vacate its May 29, 2014 order granting a new trial and granting ASA's motion for new trial. The writ will issue only if the trial court fails to act in accordance with this opinion. The stay this court issued on August 3, 2015 is lifted.


/s/    Kem Thompson Frost
Chief Justice


Panel consists of Chief Justice Frost and Justices Christopher and Busby.

25